## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

CATHY SMITH AND RAMSEY SMITH,      )
      )
      Plaintiffs,      )
      )
      vs.      )      Civil No. 2021-76
      )
RYAN MEADE AND NICOLE MEADE,      )
      )
      Defendants.      )
      )
_____ )

## REPORT AND RECOMMENDATION AND ORDER

Before the Court is plaintiffs Cathy and Ramsey Smith's "Motion to Amend Complaint." [ECF 10].   Defendants Ryan and Nicole Meade filed an opposition and plaintiffs replied.   [ECFs 29, 30].

## I.      BACKGROUND

The Smiths allege as follows.   In 2015, the Smiths and the Meades signed a purchase agreement stipulating that the Meades would sell the Smiths a property on St. Thomas.   Compl. [ECF 1] ¶¶ 7, 8.   The purchase agreement provided that the Meades would "seller finance" the property for up to 60 months.   *Id.* ¶ 9.   It also provided that during the seller financing period, the Smiths were responsible for, among other things, paying the insurance premiums on the property. *Id.*   In the event of a loss, the purchase agreement provided that any proceeds from an insurance claim on the property belonged to the Smiths.   *Id.* ¶ 13.

Before the sale could be completed, Hurricane Irma hit St. Thomas and severely damaged the property.   Compl. [ECF 1] ¶¶ 10-12.   Thereafter, the parties agreed to hire a public adjuster to help them with their insurance claim; Ryan Meade signed the contract with the adjuster.   *Id.* ¶¶ 19, 21.   The parties further agreed, in an addendum to the purchase agreement, that any proceeds

from their claims would be distributed among the parties and the adjuster according to predetermined percentages. *Id.* ¶ 22. After receiving a loss estimate from the adjuster, the Meades began negotiating with the insurance company. *Id.* ¶¶ 24-26. Without informing the Smiths, Ryan Meade subsequently signed a sworn proof of loss and received an interim payment of $150,000 from the insurance company. *Id.* ¶ 34. When the Meades did tell the Smiths about the payment, they falsely told them that the interim payment had to cover the parties' attorney's fees. *Id.* ¶ 35. Two months later, the Meades sent the Smiths a check for $84,500 as an "interim settlement" and stated that of that amount, $39,500 was owed to Ryan Meade's law firm pursuant to a contingency fee arrangement. *Id.* ¶ 41. Several months later, again without notifying the Smiths, the Meades signed a second release with the insurance company and received a final payment of $110,000. *Id.* ¶¶ 43, 44. This time, the Meades sent the Smiths a check for $4,800.00, much less than the Smiths were due. *Id.* ¶¶ 48, 50.

On multiple occasions, the Smiths demanded that the Meades provide them with an accounting of the insurance proceeds, but they never received one. *Id.* ¶¶ 52, 53. Approximately six months after receiving the second check from the Meades, the Smiths learned for the first time that Ryan Meade's law firm never performed any work on their case. *Id.* ¶¶ 56-60. The Smiths assert seven counts in the original Complaint: (1) breach of contract, (2) breach of good faith and fair dealing, (3) fraud (in the alternative), (4) misrepresentation (in the alternative), (5) unjust enrichment (in the alternative), (6) conversion (in the alternative), and (7) breach of fiduciary duty/accounting. *Id.* ¶¶ 67-130.

In the instant motion, the Smiths propose supplementing the complaint with the following additional facts. [Proposed] First Am. Verif. Compl. ("PFAVC") [ECF 10-3] ¶¶ 67-89. In August 2021, prior to filing this case, the Smiths filed another case in this Court based on the same

underlying facts.   *Id.* ¶ 67.   One month later, the parties reached an interim agreement, wherein the Meades promised to provide the Smiths with an immediate payment of $95,000, an insurance authorization, and copies of other documents related to the parties' insurance claim.   PFAVC [ECF 10-1] at 2.   In return, the Smiths promised to dismiss the August 2021 case without prejudice.   *Id.*   Lastly, the interim agreement provided that the parties would engage in mediation within 30 days, but that if the matter was not fully resolved or if the Smiths believed the Meades were not acting in good faith, the Smiths could refile their suit in district court.   *Id.* at 3.

Shortly thereafter, the Smiths did dismiss the August 2021 case.   PFAVC [ECF 10-3] ¶ 70.   The Meades then filed suit against the Smiths in the Superior Court of the Virgin Islands. *Id.* ¶¶ 71, 72.   The Meades also made numerous false and defamatory statements about the Smiths to members of the Virgin Islands community.   *Id.* ¶¶ 81-89.   Based on these additional allegations, the Smiths now seek to add claims for (1) breach of contract (interim agreement), (2) breach of good faith and fair dealing (interim agreement), (3) defamation, and (4) unfair trade practices.   *Id.* ¶¶ 154-196.

## II.   LEGAL STANDARDS

A.   <u>Motions to Amend Under Federal Rule of Civil Procedure 15(a)</u>

Rule 15(a) provides that leave to amend a complaint should be freely given when justice so requires.   However,

> [w]hile Rule 15(a) provides that leave to amend should be "freely given," a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party

*Hill v. City of Scranton*, 411 F.3d 118, 134 (3d Cir. 2005); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).

"In the Third Circuit, delay alone does not justify denying a motion to amend."   *Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 225 (E.D. Pa. 2012) (citing *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F. 3d 267, 273 (3d Cir. 2001)).   Rather, the delay must either be undue, such that it places "an unwarranted burden on the court," or it must be prejudicial, such that it places "an unfair burden on the opposing party."   *Synthes*, 281 F.R.D. at 225 (quoting *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984)).   "Implicit in the concept of undue delay is the premise that Plaintiffs, in the exercise of due diligence, could have sought relief from the court earlier."   *Synthes*, 281 F.R.D. at 225 (quotation marks omitted).   Thus, in assessing delay, the court must balance any imposition or prejudice caused by the delay against the plaintiff's reasons for the delay.   *Id.* at 225-26 (citing *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 520 (3d Cir. 1988)).

"Futility" denotes that "the complaint, as amended, would fail to state a claim upon which relief may be granted."   *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).   Thus, "[i]n assessing futility, the district court applies the same standard of legal sufficiency as applies under [FRCP] 12(b)(6)."   *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996)).   In other words, the court must determine whether the complaint includes "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).   "If a proposed amendment is not clearly futile, then denial of leave to amend is improper."   6 Wright & Miller, *Federal Practice & Procedure* § 1487 (3d ed. 2019). In other words, "a complaint will not be dismissed for failure to state a claim unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir. 1980).

"[P]rejudice to the non-moving party is the touchstone for the denial of an amendment," and such prejudice must be substantial or undue. *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (quoting *Cornell & Co. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978) (quotation marks omitted)). Thus, the defendant "must do more than merely claim prejudice; it must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the . . . amendments been timely." *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989). Courts evaluate prejudice "by looking at whether the amendment would: (1) require the non-moving party to expend significant additional resources to conduct discovery and prepare for trial; (2) significantly delay the resolution of the dispute; or (3) prevent the non-moving party from bringing a timely action in another forum." *Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 2017 WL 4404565, at *2 (D.N.J. Oct. 4, 2017). Ultimately, whether to grant leave to amend lies within a court's discretion. *Pennsylvania Emps. Ben. Tr. Fund v. Zeneca, Inc.*, 499 F.3d 239, 252 (3d Cir. 2007).

### III.   DISCUSSION

A.   <u>Whether the Smiths' Motion is Timely</u>

On December 15, 2021, the undersigned entered a Trial Management Order setting a February 15, 2022, deadline for motions to amend the pleadings or add new parties. [ECF 21] at 1. The motion to amend, filed on December 6, 2021, is therefore timely.

B.   <u>Whether the Proposed Additional Claims are Futile</u>[1]

---

[1]  For the sake of expediency, the Court focuses solely on whether an amendment to the Complaint is permitted under FRCP 15, rather than on the numerous and often frivolous additional arguments made by both parties in their respective filings.

1. <u>Breach of Contract (Interim Agreement)</u>

"To [state a] breach of contract claim under Virgin Islands law, a plaintiff must [allege] four elements: (1) an agreement; (2) a duty created by that agreement; (3) a breach of that duty; and (4) damages."  *Wheatley v. Mapp*, 2016 WL 1092565, at *9 (D.V.I. Mar. 21, 2016).

In Count 8 of the PFAVC, the Smiths allege in part as follows:

155. The Interim Agreement was a contract between the SMITHS and the MEADES.

156. Pursuant to the Interim Agreement the MEADES contractually agreed to pay the SMITHS $95,000.00 as follows:
 a. $10,500.00 towards attorneys' fees and costs incurred by the SMITHS as of September 10, 2021
 b. $84,500.00 towards principal of money owed to the SMITHS by the MEADES (related to the MEADES' theft of money from the SMITHS).

157. The MEADES only paid the SMITHS $94,985.00.

158. The MEADES contractually agreed to mediate the parties' disputes on October 14, 2021.

159. The MEADES contractually agreed to act in good faith in fulfilling the purposes of the Interim Agreement.

160. The MEADES contractually agreed to provide releases of information to the SMITHS on request.

161. The SMITHS provided the MEADES (through attorney Joel Holt) releases for bank account information and tax authorizations pursuant to the Interim Agreement.

162. The MEADES breached the Interim Agreement, including but not limited to, as follows:
 c. Failing to pay the agreed upon amount to the SMITHS
 d. Failing to provide the agreed upon releases to the SMITHS

    e.  Filing, and hiding the filing from the SMITHS, the Superior Ct Case a mere two (2) days after the SMITHS dismissed the First DC Case

  163. The SMITHS fully performed under the Interim Agreement.

  164. The SMITHS have been, and continue to be, damaged by the conduct of the MEADES in an amount and character to be proven at trial.

PFAVC [ECF 10-3] ¶¶ 155-164.

  These allegations are sufficient to state a claim for breach of contract. The Smiths have alleged facts in support of all necessary elements of the claim.

  2. <u>Breach of the Duty of Good Faith and Fair Dealing (Interim Agreement)</u>

  "In the Virgin Islands, every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Arvidson v. Bucher*, 2019 WL 4307580, at *23 (V.I. Super. Sept. 10, 2019) (quotation marks omitted). Breach of this implied covenant occurs when one party acts in a way that deprives another party of the benefits for which it bargained. *Id.* To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must show (1) the existence of a valid contract between the parties, and (2) that defendant committed acts that "amount to fraud or deceit or an unreasonable contravention of the parties' reasonable expectations under the contract." *Id.* "To successfully allege an act of fraud or misrepresentation, a complainant must demonstrate: (1) a knowing misrepresentation of a material fact, (2) intent by the defendant that the plaintiff would rely on the false statement, (3) actual reliance, and (4) detriment as a result of that reliance." *Stapleton v. WenVI, Inc.*, 2014 WL 3765855, at *3 (D.V.I. July 30, 2014) (quotation marks omitted). *Id.*; *but see Remak v. Virgin Islands Water & Power Auth.*, 2017 WL 3122642, at *2, 4 (V.I. Super. July 21, 2017) (concluding that the standard for proving a claim for breach of the implied covenant of good faith and fair

dealing in the Virgin Islands remains unclear because the Virgin Islands Supreme Court has not

clarified whether a *Banks* analysis must always be performed to establish binding precedent).

In Count 9 of the PFAVC, the Smiths allege in part as follows:

167.  The SMITHS and the MEADES had a contract—the Interim Agreement.

168.  In the performance of the contract (the Interim Agreement), the MEADES engaged in fraudulent and deceitful conduct, in contravention of the justifiable expectations of the SMITHS—namely, filing the Superior Ct Case and hiding its existence from the SMITHS and attempting to obtain a unilateral release from the SMITHS at the 10/14/21 mediation while maintaining the (false and fraudulent) claims in the Superior Ct Case.

169.  The fraudulent and deceitful conduct of the MEADES was inconsistent with the reasonable expectations of the SMITHS—the SMITHS reasonably expected that the MEADES would mediate on 10/14/21 in good faith and not conceal material facts from the SMITHS.

170.  The fraudulent and deceitful conduct of the MEADES occurred during the time of the performance of the Interim Agreement and after the time for the performance of the Interim Agreement had ended.

171.  The fraudulent and deceitful conduct of the MEADES was inconsistent with the reasonable expectations of the SMITHS—the SMITHS reasonably expected that the MEADES would mediate on 10/14/21 in good faith and reasonably expected that the MEADES would not surreptitiously file the Superior Ct Case a mere two (2) days after the SMITHS dismissed the First DC Case.

172.  The MEADES have maintained the Superior Ct Case.

\* \* \*

174.  The SMITHS have been damaged as a result of the breach of the duty of good faith and fair dealing by the MEADES and are entitled to compensatory, incidental, and

> consequential damages for their conduct, as well as for all
> costs, expenses, attorneys' fees, and interest.

PFAVC [ECF 10-3] ¶¶ 167-172, 174.

These allegations, in conjunction with the additional facts alleged, are sufficient to state a

claim for breach of the duty of good faith and fair dealing.   The Smiths allege the existence of a

contract—the interim agreement.   They further allege a knowing misrepresentation of a material

fact by claiming that at mediation, the Meades intentionally hid their filing of a suit against them

in Superior Court while simultaneously trying to obtain a unilateral release of the claims in the

Smiths' first district court case.   Finally, the Smiths allege reliance and harm by claiming that

because they assumed that the Meades were participating in mediation in good faith, they

dismissed their suit in district court.

    3.    Defamation

"[To state a] defamation claim under Virgin Islands law, a party must [allege]: a false and

defamatory statement concerning another; an unprivileged publication to a third party; fault

amounting at least to negligence on the part of the publisher; and either actionability of the

statement irrespective of special harm or the existence of special harm caused by the publication."

*Joseph v. Connor*, 2021 WL 3291766, at *3 (V.I. Super. Feb. 18, 2021) (quotation marks omitted).

In Count 10 of the PFAVC, the Smiths allege in part as follows:

> 177.    Ryan Meade was terminated from his employment with
> [Quintairos, Prieto, Wood & Boyer, P.A. ("QPWB")].

> 178.    The reasons for Ryan Meade's termination from QPWB
> included, but were not limited to, his history of unethical
> conduct and violations of his employment/partnership
> agreement with QPWB.

179.   The MEADES are and were aware that the reasons why Ryan Meade was terminated from QPWB included reasons unrelated to his theft of money from the SMITHS.

180.   The MEADES stated to numerous members of the Virgin Islands community that the reason that Ryan Meade was terminated was a result of the SMITHS seeking to recover the insurance proceeds (as further set forth in this complaint).

\* \* \*

182.   The MEADES claimed to members of the Virgin Islands community (and others, elsewhere) that the SMITHS were seeking to recover the money they were owed in an attempt to injure the MEADES.

183.   The MEADES claimed to members of the Virgin Islands community (and others, elsewhere) that Ryan Meade was terminated from his employment from QPWB solely as a result of the SMITHS seeking to recover the stolen money.

184.   The MEADES published these false assertions through both oral and written assertions to members of the Virgin Islands community that were friends, colleagues, and/or customers of the SMITHS and/or the SMITHS business.

185.   The MEADES did this intentionally, however, at a minimum, the MEADES were negligent in their false statements that were defamatory.

186.   The MEADES made the false and defamatory statements in an attempt to harm the SMITHS personally and the SMITHS business, Virgin Islands Coffee Roasters.

187.   The MEADES publication of the false and defamatory statements were not solely part of or during the course of a judicial proceeding and were not related to a judicial proceeding – these false and defamatory statements were made and intended to cause harm to the SMITHS.

188.   The false and defamatory statements of the MEADES actually did cause harm to the SMITH[S.]

PFAVC [ECF 10-3] ¶¶ 177-180, 182-188.

These allegations are insufficient to state a claim for defamation for the simple reason that they lack specificity. Aside from generalities and conclusory statements, the Smiths do not indicate when the allegedly defamatory statements were made, who made the statements, and what the statements were. *See Ali v. Intertek Testing Servs. Caleb Brett*, 332 F. Supp. 2d 827, 831 (D.V.I. 2004) (denying motion to amend the complaint to add a claim for defamation where plaintiff failed to "specify when the allegedly defamatory statements were made, by whom, or what they contained."); *accord Illaraza v. Hovensa, L.L.C.*, 2010 WL 2342424, at *4 (D.V.I. June 7, 2010) (holding that "the lack of detail in plaintiff's defamation claim warranted dismissal of plaintiff's claim where the plaintiff did not 'indicate when, where, or how the alleged statements were made' and did not 'identify the specific content of any challenged statement.'").

4.   Unfair Trade Practices

The Virgin Islands Consumer Protection Law ("CPL") provides that "[n]o person shall engage in any deceptive or unconscionable trade practice in the sale, lease, rental or loan or in the offering for sale, lease, rental, or loan of any consumer goods or services, or in the collection of consumer debts."  12A V.I.C. § 101.  "[T]o state a claim under CPL, a plaintiff must establish the following elements: (1) defendant is a 'person' under CPL; (2) defendant is engaged in a deceptive or unconscionable trade practice; and (3) the deceptive or unconscionable trade practice occurred during the sale, lease, rental or loan of any consumer goods or services."  *Gov't of United States Virgin Islands v. Takata Corp.*, 67 V.I. 316, 381 (V.I. Super. June 19, 2017).

Although the CPL does not define the term "person," the Virgin Islands "Legislature has instructed that the term includes corporations, companies, associations, joint stock companies, firms, partnerships, and societies, as well as individuals." *Takata Corp.*, 67 V.I. at 382.  The

CPL does, however, provide definitions for the other relevant terms.   A "deceptive trade practice"

is defined as

> any false, falsely disparaging, or misleading oral or written
> statement, visual description or other representation of any kind
> made in connection with the sale, lease, rental, or loan of consumer
> goods or services, or in the extension of consumer credit or in the
> collection of consumer debts, which has the capacity, tendency or
> effect of deceiving or misleading consumers.

12A V.I.C. § 102(a).   Further, an "unconscionable trade practice" is defined as

> any act or practice in connection with the sale, lease, rental or loan
> or in connection with the offering for sale, lease, rental or loan of
> any consumer goods or services, or in the extension of consumer
> credit, or in the collection of consumer debts which unfairly takes
> advantage of the lack of knowledge, ability, experience or capacity
> of a consumer; or results in a gross disparity between the value
> received by a consumer and the price paid, to the consumer's
> detriment;

*Id.* § 102(b).   Lastly, "'[c]onsumer goods, services, credit and debts' as used in sections 101,

102(a) and 102(b) of this chapter [of the CPL], means goods, services, credit and debts which are

primarily for personal, household or family purposes."   *Id.* § 102(c) (alteration added).

In Count 11 of the PFAVC, the Smiths allege in part as follows:

> 190.   At the time that the MEADES made the false representations
> that legal work was being performed which would entitle
> either the MEADES or QPWB to "attorney's fees" those
> representations were (intentionally) misleading and were
> made in connection with the 'sale' of consumer services as
> defined in 12A V.I.C. 102.

> 191.   The MEADES made written representations that legal
> services were to be offered, and that legal services had
> actually been performed and payment was required, they
> were not; there was a clear failure to state material facts—
> namely that no legal services had been performed by QPWB
> and that RYAN MEADE would be in violation of his
> partnership/employment agreement with QPWB by

individually retaining "attorney's fees" for non-existent work.

192.    The MEADES made written representations that legal services, in the form of litigation and other legal services, were necessary to resolve the insurance claim when they were in fact not needed.

193.    The MEADES unfairly took advantage of the fact that the SMITHS were not experienced with the recovery process of insurance claims and the MEADES represented that because RYAN MEADE was an experienced lawyer that legal services were necessary and were actually performed—they were not—which had the effect of unfairly taking advantage of the SMITHS lack of knowledge, ability, experience or capacity related to the settlement of insurance claims.

194.    In addition, the MEADES unfairly deprived the SMITHS of at least $128,050.00 and no legal work was performed, which results in a gross disparity between the value received by the SMITHS and the amount of money which the MEADES wrongfully kept.

195.    The MEADES conduct in engaging in Unfair Trade Practices was willful and malicious and punitive damages are appropriate.

PFAVC [ECF 10-3] ¶¶ 190-95.

Whether the act of falsely promising and then charging for legal services that were never provided states a claim under the CPL appears to be an issue of first impression in the Virgin Islands.   Some jurisdictions exclude legal services from coverage under their versions of the CPL, given that legal services are generally dealt with under other regulatory schemes.  *See, e.g.*, *Preston v Stoops*, 285 S.W.3d 606, 609 (Ark. 2008) (legal services not covered by consumer protection law because of separation of powers); *Doyle v. Frederick J. Hanna & Assocs., P.C.*, 695 S.E.2d 612, 615-16 (Ga. 2010) (state legislature could have specifically mentioned legal services if such services were meant to be covered); *Cripe v. Leiter*, 703 N.E.2d 100, 105-07 (Ill.

1998) (lawyers are regulated by the state supreme court; legal services are not covered by consumer protections laws).[2]

In *Brady v. Cintron*, however, the Supreme Court of the Virgin Islands found that while "health care providers are subject to claims for deceptive trade practices, only the entrepreneurial or commercial aspects of the profession are covered."   2011 WL 4543906, at *10 (V.I. Sept. 27, 2011).[3]   The court characterized the claim in *Brady* as a "medical malpractice claim recast as a deceptive trade practices claim" in affirming dismissal of that claim.   *Id.* at *11.   The reasoning in *Brady* may well extend to the provision of legal services should such a case come before that court.

Here, the allegations in the CPL count of the PFAVC do not distinguish between conduct attributable to Ryan Meade and Nicole Meade in this context, but the Smiths allege elsewhere that Nicole Meade is not a licensed attorney.   PFAVC [ECF 10-3] ¶ 100.   The Smiths cannot state a claim against both Meades for deceptive trade practices in providing legal services merely by

---

[2]   Further, in *Beyers v. Richmond*, the court found that the collection and distribution of settlement proceeds by an attorney was outside the scope of consumer protection law:

> Most states have enacted a consumer protection statute. The majority of jurisdictions that have addressed this issue have held that the regulation of attorneys does not fall within the ambit of consumer protection laws.   A minority of jurisdictions has carved out an exception for entrepreneurial aspects of the practice of law, such as advertising and debt collection, while recognizing that claims which allege negligence or legal malpractice are exempt from the consumer protection laws.   Courts which strictly adhere to the separation of powers doctrine hold that consumer protection laws do not apply to attorneys. Other jurisdictions hold that the consumer protection statutes do not apply to the practice of law based upon the existence of regulatory boards, or explicit exemptions for attorneys within statutes.   However, some jurisdictions have indicated implicitly that in certain circumstances a claim could be brought against an attorney under the consumer protection act, and still other jurisdictions have not decided the issue.

937 A.2d 1082, 1086-87 (Pa. 2007).

[3]   *Brady* was overruled on other grounds by *Mills-Williams v. Mapp*, 2017 WL 2998939 (V.I. 2017).

lumping them together in the allegations.   Based on the balance of the PFAVC, there is no indication that any specific communications were made by Nicole Meade, particularly in the context of the CPL allegations.   At the very least, therefore, the undersigned recommends that the amendment to add a claim for deceptive trade practices in the provision of legal services against Nicole Meade not be permitted.

With respect to the allegations against Ryan Meade, it appears that the CPL-related allegations may touch on the entrepreneurial or commercial aspects of the legal profession.   Given the Virgin Islands Supreme Court's reasoning in *Brady,* coupled with the fact that motions to amend are only denied if it appears beyond doubt that the movant will not ultimately be able to prove facts that would entitle him to succeed on his claim, the Court finds that the Smiths may be able to state a claim for unfair trade practices under the CPL against Ryan Meade.   At least at the motion to amend stage, plaintiffs should be permitted to go forward.

## IV.   CONCLUSION

Accordingly, the premises considered, it is hereby RECOMMENDED that the Smiths' "Motion to Amend Complaint" [ECF 10] be DENIED insofar as it seeks to add a claim for defamation, and insofar as it seeks to add a claim under the CPL against Nicole Meade.

Further, the following is hereby ORDERED:

(1)     The Smiths' "Motion to Amend Complaint" [ECF 10] is GRANTED insofar as it seeks to add claims for breach of contract, breach of the duty of good faith and fair dealing, as well as a claim for unfair trade practices against Ryan Meade;

(2)     The Smiths shall file their First Amended Complaint no later than April 11, 2022; and

(3)     The Meades shall respond to the First Amended Complaint in accordance with the applicable rules.

*Smith, et al. v. Meade, et al.*
Civil No. 2021-76
Page 16


Any objections to this Report and Recommendation must be filed in writing within 14 days of receipt of this notice.   Failure to file objections within the specified time shall bar the aggrieved party from attacking such Report and Recommendation before the assigned District Court Judge. 28 U.S.C. § 636(b)(1); LRCi 72.3.


**Dated:** March 24, 2022                            S_____

**RUTH MILLER**
United States Magistrate Judge